## MIDLAND VALLEY R. CO. v. SUTTER et al.*

Circuit Court of Appeals, Eighth Circuit.
July 30, 1928.

No. 8080.

O. E. Swan, of Muskogee, Okl. (J. D. Gibson, of Muskogee, Okl., on the brief), for appellant.

H. W. Hart, of Wichita, Kan. (Charles G. Yankey, John Gleason, Kenneth Cox, John Gregory Sears, Glenn Porter, Enos E. Hook, and W. G. McDonald, all of Wichita, Kan., on the brief), for appellees.

Before LEWIS, Circuit Judge, and PHILLIPS and JOHN B. SANBORN, District Judges.

PHILLIPS, District Judge. This is a suit by the Midland Valley Railroad Company (hereinafter called the railroad company) against O. E. Sutter, H. H. Birkett, The Derby Oil Company, Iva Wartick, W. W. Wartick, Verda Teter, C. C. Teter, Iona Miller, L. E. Miller, M. V. Spence, Murriel

*Rehearing denied November 16, 1928.

164

Spence, and Raymond Spence, and Iona Miller, as guardian of Elda Pearl Spence, a minor, to enjoin them from entering upon the right of way of the railroad company and constructing thereon derricks and other structures, and from drilling for and producing oil and gas thereon.

On June 5, 1911, Adolph Blank and Sarah O. Blank, his wife, conveyed to the Wichita & Midland Valley Railroad Company, for a railroad right of way, the following described tract of land:

"The east one-half of block eighty-seven (87) and eighty-eight (88) in the city of Oxford, more particularly described as a strip of land one hundred ninety-five (195) feet in width, lying west of and adjacent to the center line of said railroad, * * * containing in all three (3) and 46⁄100 acres."

On May 17, 1911, W. H. Spence, and I. E. Spence, his wife, conveyed to the Wichita & Midland Valley Railroad Company for a railroad right of way, the following described tract of land:

"The west one-half of blocks sixty-eight (68) and sixty-nine (69) in the city of Oxford, more particularly described as a strip of land one hundred ninety-five (195) feet in width lying east of and adjacent to the center line of said railroad as now located in Colorado street along the west of said blocks, containing three and four-tenths (3.4) acres in the city of Oxford."

On March 14, 1911, the Wichita & Midland Valley Railroad Company entered into a lease with the railroad company for the term of 50 years from July 29, 1910, of its railroad property, including the particular rights of way acquired by it from Blank and Spence.

After Blank had conveyed to the railroad company a right of way in and across the east half of blocks 87 and 88, he conveyed certain land adjoining the same, to wit, outlots 26 and 27 and the west half of blocks 87 and 88, containing 13.3 acres of land, to E. C. Lyman. By a series of mesne conveyances the land conveyed by Blank to Lyman finally passed to Louie Fritz, the present owner. On November 24, 1923, Louie Fritz and Nellie Fritz, his wife, executed and delivered to the Roxana Petroleum Corporation an oil and gas lease of the west half of blocks 87 and 88 for a term of five years from date, and as long thereafter as oil or gas should be produced thereon.

On May 25, 1927, Adolph Blank executed a quitclaim deed to H. H. Birkett of all his right, title, and interest in and to the east half of blocks 87 and 88. On May 31, 1927, H. H. Birkett executed an oil and gas lease of the east half of blocks 87 and 88 to O. E. Sutter. On July 19, 1927, after the commencement of this suit, Louie Fritz executed to H. H. Birkett a quitclaim deed to the east half of blocks 87 and 88.

On February 28, 1912, William H. Spence executed a warranty deed to Ola Cowger, conveying the land adjoining the right of way theretofore conveyed by Spence to the railroad company. The Derby Oil Company holds a three-fourths interest in a purported oil and gas lease of the west half of blocks 68 and 69 from the heirs of William H. Spence. All of the heirs of William H. Spence are parties defendant to this action.

About June 29, 1927, the defendants went upon the east half of blocks 87 and 88 and the west half of blocks 68 and 69 at points more than 50 feet distant from the center line of the main line track, and placed thereon oil derrick timbers, tools, machinery, and appliances, and commenced the necessary operations for the drilling of three oil and gas wells.

On November 9, 1927, after a hearing on the merits, the trial court entered a decree in which he adjudged and decreed: That the defendants were entitled to drill for, operate for, and produce oil on the railroad company's right of way at points 50 feet or more from the center of the main line track; that the defendants should drill only such number of wells as were necessary to offset other wells on adjacent property; and that such wells should be drilled at places which would not prevent the laying or operating of a side track proposed to be built by the railroad company. It further adjudged and decreed that the court should retain jurisdiction of the cause for the purpose of determining in the future the right and necessity of the railroad company to use and occupy such part of the land as should be used by defendants in the drilling and operation of oil and gas wells. This is an appeal from that decree.

■ Under the statutes of Kansas and the decisions of the Supreme Court of Kansas, minerals under a railroad right of way belong to the owner of the fee, and not to the railroad company. Missouri, K. & N. W. R. Co. v. Schmuck, 69 Kan. 272, 76 P. 836; Harvey v. Missouri Pacific R. Co., 111 Kan. 371, 207 P. 761, 50 A. L. R. 300. The railroad company admits that it does not own the oil and gas lying underneath its right of way, but contends that the right to remove such oil and gas from the east half of blocks 87 and 88 is vested in the Roxana Petroleum Corporation under its oil and gas lease, and

that the right to remove such oil and gas from the west half of blocks 68 and 69 is vested in Ola Cowger, or his successor in title. This contention is supported by the decision of this court in the case of Roxana Petroleum Corporation v. Sutter et al. (No. 8090; opinion filed July 30, 1928) 28 F.(2d) 159, and what we said there need not be reiterated here.

The railroad company further contends that, even if the defendants own the oil and gas underneath the surface of the right of way tracts involved herein, they have no right, under the facts and circumstances of this case, to go upon the surface of such right of way and construct thereon derricks and other structures, and drill for and produce oil and gas thereon. On the other hand, the defendants contend that they have the right to take the oil and gas in such right of way tracts, and that they have the right to go upon such right of way tracts and to drill for and produce oil and gas thereon, so long as they do not interfere with the use thereof by the railroad company for railroad purposes.

Speaking of the character of a railroad right of way, the Supreme Court of the United States, in Western Union Teleg. Co. v. Pennsylvania R. Co., 195 U. S. 540, at page 570, 25 S. Ct. 133, 141 (49 L. Ed. 312) said:

"A railroad right of way is a very substantial thing. It is more than a mere right of passage. It is more than an easement. We discussed its character in New Mexico v. United States Trust Co., 172 U. S. 171 [19 S. Ct. 128, 43 L. Ed. 407]. We there said (page 183 [19 S. Ct. 133]) that, if a railroad's right of way was an easement, it was 'one having the attributes of the fee, perpetuity and exclusive use and possession; also the remedies of the fee, and, like it, corporeal, not incorporeal, property.' * * * A railroad's right of way has, therefore, the substantiality of the fee, and it is private property, even to the public, in all else but an interest and benefit in its uses. It cannot be invaded without guilt of trespass. It cannot be appropriated in whole or part, except upon the payment of compensation. In other words, it is entitled to the protection of the Constitution, and in the precise manner in which protection is given. It can only be taken by the exercise of the powers of eminent domain."

See, also, Northern Pacific Ry. Co. v. North American Teleg. Co. (C. C. A. 8) 230 F. 347, 349, 350, L. R. A. 1916E, 572.

The courts of the several jurisdictions in this country are not in accord on the question of the right of an adjoining owner to use land taken by a railroad company for right of way purposes. In some jurisdictions, it is held that the owner of the servient estate in land over which the railroad owns a right of way may use such land in any manner which does not interfere with its use for railroad purposes. 33 Cyc. 190; 22 R. C. L. § 113, p. 862. The decisions of the national courts and of a majority of the state jurisdictions, however, are to the effect that the railroad company is entitled to the exclusive use and possession of its right of way, and that the owner of the servient estate has no right to occupy the surface of the land conveyed for right of way, in any mode, or for any purpose, without the railroad company's consent. Cairo, V. & C. Ry. Co. v. Brevoort (C. C.) 62 F. 129, 25 L. R. A. 527; Wright v. St. Louis S. W. Ry. Co. (C. C.) 175 F. 845; Chicago Great Western R. Co. v. Zahner, 145 Minn. 312, 177 N. W. 350; Paxton v. Yazoo & M. V. R. Co., 76 Miss. 536, 24 So. 536; Wilmot v. Yazoo & M. V. R. Co., 76 Miss. 374, 24 So. 701; Hayden v. Skillings, 78 Me. 413, 6 A. 830; Troy & B. R. Co. v. Potter, 42 Vt. 265, 1 Am. Rep. 325; Jackson v. Rutland & B. R. Co., 25 Vt. 159, 60 Am. Dec. 246; Pittsburgh, C. & St. L. R. Co. v. Jones, 86 Ind. 496, 44 Am. Rep. 334; New York, N. H. & H. R. Co. v. Armstrong, 92 Conn. 349, 102 A. 791; Illinois Cent. R. Co. v. Houghton, 126 Ill. 233, 18 N. E. 301, 1 L. R. A. 213, 9 Am. St. Rep. 581; Pittsburgh, Ft. W. & C. Ry. Co. v. Peet, 152 Pa. 488, 25 A. 612, 19 L. R. A. 467; Central of Georgia Ry. Co. v. Faulkner (Ala. Sup.) 114 So. 686.

In Chicago Great Western R. Co. v. Zahner, supra, the court said:

"The trial court held that the defendant might use the right of way deeded by her predecessor in title, so long as such use did not disturb the plaintiff in its use for railway purposes. It is not shown by the evidence that the railway company intends making any definite present use of the right of way occupied by the defendant other than the ordinary right of way use for purposes of traffic. After an attentive consideration, we find ourselves unable to adopt the conclusion reached by the trial court. * * * Well-considered cases recognize that an easement for a railroad right of way differs in important respects from other easements, that the right of possession of the right of way is exclusive in the railroad, and that the question of the necessity of its use by the railroad at a particular time, and the question whether its partial occupancy by the owner of the servient estate can be maintained with-

out impairing the enjoyment by the railroad, are not open to controversy whenever the servient owner chooses to take partial possession."

After citing a long line of cases and quoting the rule laid down in a number of such cases, the Minnesota court further said:

"We think that the rule indicated is the prevailing one and is founded on sound principle and is the practical working rule. The railroad, charged with the performance of public duties which it cannot evade, and with liabilities which it cannot limit, should, for its own protection as well as in the interest of the public, be accorded the free use of its right of way, undisturbed by the claims of adjoining owners to a partial occupancy or use."

In Cairo, V. & C. R. Co. v. Brevoort, supra, the court said:

"The complainant owns a right of way over and across the lands of the defendant, 200 feet in width. * * * The complainant acquired an easement in the land, whose nature and extent are such as is necessary for the purpose of maintaining and operating its railway. The estate of the complainant is the dominant, and that of the defendant the servient. Davidson v. Nicholson, 59 Ind. 411; Robinson v. Thrailkill, 110 Ind. 117, 10 N. E. 647. The grant of an easement conveys all such incidental rights as are necessary to the enjoyment of the thing granted. The use to which an easement is devoted, or for which it is created, determines its character, and, to the extent that the use is necessary to carry out the purpose of the grant, the rights of the owner of the easement are paramount. An easement granted to a railway is essentially different from any other. The nature of railway service requires exclusive occupancy. A railroad company is held to the highest degree of care, and the exercise of this care necessarily requires that it should have complete dominion over its right of way. ·It is bound to prevent obstructions from being placed on its tracks, and is required to keep them fenced in, and free from rubbish or other combustible materials. The duties of a railway company are due to the public as well as to individuals, and these duties it must perform at its peril. The rules which apply to the use of streets or highways fail, when applied to railroads, because the necessities of their use are different. The railroad must have the exclusive possession and control of the land within the lines of its location, and the right to remove everything placed or growing thereon, which it may deem necessary to remove to insure the safe management of its road."

In Jackson v. Rutland & B. R. Co., supra, the court said:

"The right of a railway company to the exclusive possession of the land taken for the purposes of their road differs very essentially from that of the public in the land taken for a common highway. The railway company must, from the very nature of their operations, in order to the security of their passengers, workmen, and the enjoyment of the road, have the right at all times to the exclusive occupancy of the land taken, and to exclude all concurrent occupancy, by the former owners, in any mode and for any purpose. Any other view of the subject must lead to the imminent peril of life and property."

It is difficult to wholly reconcile the Kansas decisions on this question. In the recent case of Harvey v. Missouri Pac. R. Co., 111 Kan. 371, 207 P. 761, 50 A. L. R. 300, the court said:

"One whose property is subjected to condemnation for railway or other public uses is none the less the owner of the fee and holder of the ultimate title. He has what the law calls the servient estate. The party for whose use the condemnation was made has what is called the dominant estate. And while the fee holder, after condemnation and compensation, may not interfere with the rights of the holder of the dominant estate, yet as owner he may still continue to use the property for any purpose which does not frustrate the public aims and ends for which the property was condemned. * * * Of course, so long as the railway company did not need all the property condemned, the successive fee-title holders were strictly within their rights in occupying and using it."

In the case of Kansas Cent. Ry. Co. v. Allen, 22 Kan. 285, 31 Am. Rep. 190, the court said:

"If the railroad company required exclusive occupancy of the land taken for the use of its railroad on account of the nature of its operations, or for the security of its trains, its passengers, or its employés, it was entitled to such occupancy. * * * It is our opinion that it is a question of fact, not of law, whether the necessities of the railroad demand exclusive occupancy for its purposes, and what use of the property by the owner is a detriment to, or interference with the rights of the road."

On the other hand, in the case of Dillon et al. v. Kansas City, Ft. S. & M. R. Co., 67 Kan. 687, 74 P. 251, the court said:

"Railroad companies are public carriers, and are properly held to the highest accountability in the performance of their duties. It is highly important to the general traveling public, as well as to business interests, that such corporations have exclusive possession and uninterrupted control of all property, the use of which is necessary in the discharge of this service. If the principle of concurrent occupation of property used by such corporations in carrying on their regular traffic should obtain, the expeditious and safe performance of their duties would be difficult, if not impossible. Kansas Cent. Ry. Co. v. Allen, 22 Kan. 286, 31 Am. Rep. 190; Mo. P. Ry. Co. v. Manson, 31 Kan. 337, 2 Pac. 800; K. C. R. Co. v. Com'rs Jackson Co., 45 Kan. 716, 26 P. 394. There can be no concurrent occupancy of railroad property in actual use by it in the operation of its business without its consent."

Again, in Kansas & C. P. R. Co. v. Burns, 70 Kan. 627, 79 P. 238, the court said:

"The right acquired by a railroad company by condemnation proceeding for right of way, depot grounds, and terminal facilities dominates every right of possession, except as to the owner of the fee; and he may use only that portion which is not in immediate use by the company, and not necessary to the safe and convenient use of that which is in actual service."

And, again, in Abercrombie v. Simmons, 71 Kan. 538, 546, 81 P. 208, 211 (1 L. R. A. [N. S.] 806, 114 Am. St. Rep. 509, 6 Ann. Cas. 239), the court said:

"A right of way, although commonly designated as an easement, is an interest in land of a special and exclusive nature, and of a high character. In speaking of its character, the Supreme Court of the United States said: 'A railroad right of way is a very substantial thing. It is more than a mere right of passage. It is more than an easement. We discussed its character in New Mexico v. United States Trust Co., 172 U. S. 171, 19 S. Ct. 128, 43 L. Ed. 407. We there said (page 183 [19 S. Ct. 133]) that if a railroad's right of way was an easement it was "one having the attributes of the fee perpetuity and exclusive use and possession; also the remedies of the fee, and, like it, corporeal, not incorporeal, property." ' Western Union Tel. Co. v. Penn Railroad Co., 195 U. S. 540, 570, 25 S. Ct. 133, 141, 49 L. Ed. 312."

■ However, we think that these decisions, when analyzed in the light of the particular facts before the court in each case, warrant, if not compel, the conclusion that they limit the use of the surface of the right of way by the adjoining owner of the fee to portions of the right of way not being used by the railroad company and not necessary to the safe and convenient use of that which is in actual use.

■ We are inclined to the view that the question is one of general jurisprudence, and that we are not bound to follow the Kansas decisions. An interstate commerce railway system adequate to the country's needs is to-day recognized to be a national necessity. Texas & P. R. Co. v. Gulf, C. & S. F. Ry. Co., 270 U. S. 266, 277, 46 S. Ct. 263, 70 L. Ed. 578; Railroad Commission v. Southern Pac. Co., 264 U. S. 331, 341, 44 S. Ct. 376, 68 L. Ed. 713; New England Divisions Case, 261 U. S. 184, 189, 43 S. Ct. 270, 67 L. Ed. 605; Dayton-Goose Creek Ry. Co. v. U. S., 263 U. S. 456, 478, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472; U. S. v. Abilene & S. O. Ry. Co., 265 U. S. 274, 285, 44 S. Ct. 565, 68 L. Ed. 1016.

In New England Divisions Case the court said:

"Transportation Act 1920 [49 USCA § 71 et seq.; Comp. St. § 10071¼a et seq.] introduced into the federal legislation a new railroad policy. * * * Theretofore the effort of Congress had been directed mainly to the prevention of abuses, particularly those arising from excessive or discriminatory rates. The 1920 Act sought to insure, also, adequate transportation service. That such was its purpose Congress did not leave to inference. The new purpose was expressed in unequivocal language."

In Dayton-Goose Creek R. Co. v. U. S., the court said:

"The new act seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country."

In order to provide such a system, recognized safety measures must be followed in the maintenance of the roadbed and right of way. The railroad company is engaged in interstate commerce. It serves, not only residents of Kansas, but people generally throughout the country. It is enjoined to exercise a high degree of care by general law. In addition to this, it is subject to certain regulations and requirements by the Interstate Commerce Commission with reference to safety in the maintenance of its right of way and the operation of its trains. The basic reason for the majority rule is that exclusive possession is necessary to enable the railroad company to safely conduct its business and meet the duty of exercising that high degree of care

which the general law and administrative rules enjoin upon it. In the performance of these duties, imposed by general law and a national administrative tribunal for the public welfare, it should not be hampered by interference through the use of its right of way by the owners of the servient estate, although such use might be justified under the principles announced in local decisions. The character, nature, and extent of the right of way granted in general terms depends upon the use to which it is to be devoted. It depends upon what the railroad company requires in order to properly operate its railroad over such right of way. The requirements of the railroad company in this respect are largely determined by the duties imposed upon it by general law. These duties require it to have the exclusive possession of its right of way. It follows, therefore, that the principles of general law rather than local decision should determine the character of the rights of way granted in the instant case. Regard for the welfare of the public, the patrons, and the employés of the railroad company, in our opinion, compels such a conclusion.

■ We are further of the opinion that, even under the principles announced in the Kansas decisions, the railroad company in this case was entitled to equitable relief. Near the location of the right of way in question, the railroad passes over the lines of the Atchison, Topeka & Santa Fé Railway Company. This passage is made possible by a high fill, which is 110 feet wide at its base. The right of way, in addition to the ordinary 100-foot width, was secured in order to, provide material with which to construct and maintain this fill. The railroad is compelled from time to time to take additional dirt to maintain such fill. In 1923 and 1924, 20,-000 cubic yards of dirt were taken to repair and retain the original grade of this fill. In case of flood or other extraordinary emergency, it might have immediate need for additional materials to repair the fill. The drilling and operation of oil and gas wells upon the right of way, and the discharge of oil, salt water, and other deleterious substances therefrom, which would render the earth in such right of way valueless for fills and embankments, might materially interfere with the railroad's use of the right of way, and might endanger that portion immediately used for the operation of its trains. Under the ruling of the Kansas court in Kansas & C. P. R. Co. v. Burns, supra, the owner of the fee may not use any portion of the right of way either in the immediate use of the railroad company or necessary to the safe and convenient use of that which is in actual service. We think it a reasonable conclusion from the facts that the portion of the right of way entered upon by the defendants is necessary to the safe and convenient use of that portion in actual service.

■ The equitable writ of injunction is an appropriate remedy for the wrongs of which the railroad company complains. Kindred v. Union Pac. R. Co. (C. C. A. 8) 168 F. 648, 654.

The decree is reversed, with instructions to enter a decree permanently enjoining the defendants from entering upon the right of way tracts involved herein, from constructing oil derricks or other structures thereon, from drilling thereon for oil and gas, from operating thereon oil and gas wells, and from interfering in any manner with the railroad company in the use of such right of way for railroad purposes, and adjudging the costs of this suit in this court and in the trial court against the defendants.